184 So.2d 314 (1966)
Herman A. THOMPSON
v.
Phil A. ST. AMANT.
No. 6571.
Court of Appeal of Louisiana, First Circuit.
February 28, 1966.
Rehearing Denied April 4, 1966.
*315 R. G. Van Buskirk, Clinton, for appellant.
Robert L. Kleinpeter, of Kantrow, Spaht & Kleinpeter, Baton Rouge, for appellee.
Before ELLIS, LOTTINGER, LANDRY, REID and BAILES, JJ.
REID, Judge.
Plaintiff in this action, Captain Herman A. Thompson of the East Baton Rouge Parish Sheriff's Department, alleges he was libeled and slandered by the defendant, Phil A. St. Amant, in a television address made by the defendant and a subsequent printed news release prepared by the defendant.
The case was tried on May 5, 1964 and for written reasons assigned May 8, 1964, judgment was rendered against the defendant awarding the plaintiff the sum of $5,000 damages. Judgment was signed May 13, 1964. A motion for a new trial was filed May 18, 1964, and for written reasons assigned January 22, 1965, judgment was signed January 27, 1965 denying the motion for new trial and decreeing the judgment of May 13, 1964 the judgment of the District Court as originally rendered. It is from that judgment that defendant has lodged this appeal.
The undisputed facts of this case show that the defendant, Phil A. St. Amant, had qualified as a candidate for United States Senator against the incumbent, Senator Russell B. Long, in the Democratic Primary of 1962, and on June 27, 1962, the defendant made an appearance on WAFB-TV, Channel 9, Baton Rouge, Louisiana, during which certain remarks were made about the plaintiff. The general context of the speech was made available to the press and given wide publicity by the press.
The record shows that the political method used in this particular instance was one so frequently used, that is, to allege certain wrongdoings on the part of one individual or group of individuals and then allege a connection between that individual or group of individuals and a politician. In the present case it was sought to show a connection between Senator Long and one E. G. Partin, local leader of the Teamsters Union who was accused of all sorts of wrongdoings.
Insofar as the record here is concerned, the alleged slanderous and libelous material is contained in an affidavit by a Mr. J. D. Albin, an ex-member of the Teamsters Union, which was read by the defendant Mr. St. Amant during his television program. It appears that while the television station would be protected from statements made by Mr. St. Amant as a political candidate under the equal time provision of the Rules of the Federal Communications Commission, it would not be protected from *316 statements made by Mr. Albin if those statements were made by St. Amant over the television. For that reason the television station personnel required that the defendant read the entire affidavit, which was in the form of questions and answers. The affidavit by Mr. Albin was most broad in its accusations of various acts of commission and omission on the part of Mr. E. G. Partin, including his being involved or connected with Fidel and Raoul Castro, his misuse of Union funds, and his committing various acts of violence. It barely mentioned Mr. St. Amant's opponent. That portion of the affidavit which plaintiff contends was slanderous is set forth below:
"Mr. Albin: Yes, Frank L. Doughty on March 21st, wrote a letter to Arthur Goldberg with a copy being sent to James R. Hoffa, asking for an investigation of Teamsters Local Union #5. On the 25th, Frank L. Doughty received a reply from James R. Hoffa asking for information, any and all information concerning these charges. On Monday morning, Frank L. Doughty, which was the 27th of March, he mailed this information to Jimmy Hoffa. Later in the day, I found out Ed had, in the letter coming from Hoffa, it said on the bottom of it a notation, copies sent to Teamsters Local Union #5. Now Ed received this copy on Monday. He became pretty riled up about it and in the afternoon, A. G. Kline, who was still working at that time as an assistant and an organizer for Local Teamsters Union #5, told me that Johnny Birch had stopped him on the Airline Highway and told him Ed wanted him to help him get rid of the safe that night, that there was going to be an investigation of the local union and the records had to be destroyed and it was going to take four men to do it. He told him who all was supposed to be in on it and that they were supposed to take it to Bruce Hunt's shop. That is the man that owns Triple A construction, and cut it open that night, that it had been okayed with Bruce. Kline didn't want to be involved in this so he got his brother in New Orleans to send him a telegram so he could get out and still stay in Ed's good graces, because at this time, we still felt that there was further information that could be derived from his employment in Teamsters #5 and we knew something had to be done if we were ever to straighten out the local union. The only way to straighten it out was the removal of E. G. Partin. Now we knew that this safe was going to be removed that night. Imagine our predicament knowing of Ed's connection with the sheriff's office through Herman Thompson who made recent visits to the hall to see Ed. We also knew of money that had passed hands between Ed and Herman Thompson, from Ed to Herman. We also knew of his connections with State Lieutenant Trooper Joe Green. We knew we couldn't get any help from there and we didn't know how far he was involved in the sheriff's office or the State Police office through that and it was out of the jurisdiction of the City police. (Emphasis by the Court)
"Col. St. Amant: What did you do then?
"Mr. Albin: Well, we rode around awhile trying to decide what to do. Finally, we decided that we would go to the hall ourselves and see if there was any way we could stop them if we saw them coming out with the safe. We arrived a little too late, somewhere in the neighborhood of 9:00, the safe was gone. The next morning there was an investigation. Brother Herman Thompson came out and investigated and I understand that Lieutenant Joe Green showed up. They seemed to think *317 it was a job by a professional. I agree with them."
The above quoted portion contains the sole reference upon which plaintiff's case is based.
In the Trial Judge's original reasons for judgment and in the briefs filed by counsel for plaintiff and for defendant much jurisprudence is cited and there is a great deal of discussion as to what does or does not constitute actionable libel or slander. However, since the rendition by the Supreme Court of the United States in the case of New York Times Company v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, and in Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125, most of what was discussed is now moot and of no relevancy.
Before discussing the effects of the above cited decisions on actions of libel and slander in Louisiana, we feel we should point out certain factual matters, some contested and some uncontested, which are relevant to the issues herein and which will determine whether or not the issues in this case fall within the rule laid down by the United States Supreme Court in the recent decisions cited above.
It is undisputed that the plaintiff, Herman A. Thompson, is a well qualified, experienced law enforcement officer, having graduated from the F.B.I. National Academy, Southern Police Institute of Louisville, Kentucky, and is also a graduate of all phases of the Louisiana State University's law enforcement training program and of the East Baton Rouge Parish Sheriff's Department's own training school. He has the complete confidence of his employer, Sheriff Bryan Clemmons. Sheriff Clemmons testified that it was part of plaintiff's duties to participate in various fundraising drives for East Baton Rouge Parish, including the Baton Rouge Kids' Baseball Clinic, the Mothers' March, March of Dimes, Elk's Christmas Funds Baskets, and others.
The undisputed facts also show that the plaintiff, Herman A. Thompson, was acquainted with the said E. G. Partin; that they were on first name basis; and that plaintiff was a frequent visitor to the Union Hall. Captain Thompson admitted this in his testimony:
"Q. Isn't it true that you were a rather frequent visitor at the Union Hall and used to drop in once a week or maybe every ten days:
A. That's right.
Q. To pass the time of day?
A. To pass the time of day and just to talk to the two secretaries, to use the phone and different things like that."
He also admitted that he collected charitable contributions from Ed Partin for the Baton Rouge Kids' Baseball Clinic.
With regard to the stolen safe referred to in the quoted portion of the affidavit, the plaintiff testified that he investigated the matter with Chief Criminal Deputy George LeBlanc, who made the report, and that the Crime Lab from the State Police also assisted, and he added: "I will have to admit that there was not as much effort put out as should have been for the simple reason the night before someone had burglarized Food Town of over fifteen thousand dollars and a lot of drugs were involved and it had everyone of us tied up on that."
Both the plaintiff and Sheriff Clemmons admitted that various members of the Union might be aware that Mr. Partin on occasion gave Mr. Thompson money for some purposes, and while they both insisted that these funds were charitable contributions collected by the plaintiff for the Sheriff's office to be distributed to the proper charities, it is not inconceivable that some union members might have been suspicious of this exchange of funds.
*318 Mrs. Marjorie Ann Smith was called as a witness in behalf of the defendant. She had been employed as a secretary for Teamsters Local No. 5 from September of 1958 to August of 1961. She testified that the latter part of February or the first part of March, 1961, she received instructions from Mr. Ed Partin and "called Mr. Herman Thompson at the Sheriff's office and he wasn't in, so I left word for him to call the Union, that we had something down there for him, and he was gone on a fishing trip and so a couple of days later Mr. Thompson came by the Union Hall and he said he wanted to pick up the envelope, and so Jeanette handed it to him out of her desk drawer and he folded it and put it in his pocket." She further testified that before Captain Thompson came to pick up the envelope she and Jeanette, another secretary working with her, opened the envelope and found that it contained five twenty dollar bills. She was asked what they did after they opened the envelope and she said:
"A. We put it in another envelope and sealed it up.
Q. Now, what type of an envelope was it in, Mrs. Smith, in the first place?
A. It was a legal size envelope, one of the Teamsters', with the Teamsters' emblem and address on it.
Q. Was it addressed to anyone?
A. It just had Herman Thompson's name on the front of the envelope.
Q. Are you familiar with the handwriting in which the name `Herman Thompson' was written?
A. Yes, sir, it was Mr. Partin's."
When asked what prompted them to open the envelope she said they knew Mr. Partin was under investigation and they were just wondering what was in the envelope. She could not, however, remember whether she ever reported this incident to the law enforcement officers and said "I have been before the Federal Grand Jury and I can't remember if that was brought out or not." She also admitted that she knew Captain Thompson had picked up some checks for Kids' Baseball; that it was not unusual for Mr. Partin to give money for all the major campaigns in the area, but that this was the first cash she had ever seen. She said Captain Thompson came by the Union Hall more frequently than other officers, usually while on duty and dressed in a suit, but sometimes when he was off duty and dressed in casual clothes and that sometimes he brought his little boy with him.
The testimony of the defendant, Mr. St. Amant, is, of course, also relevant and we quote below the pertinent portion thereof:
"Q. Now, sir, at the time you made your speech, did you give any consideration whatsoever or anything at all to what effects the reference to Captain Herman Thompson's name in this speech might have upon him?
A. Actually, when the original tape was made, and understand that when I read the affidavit I did not feel that I had any right to read parts of an affidavit or to just take sections from it. I do not understand the law on this, but I believe if I am going to give a document or affidavit, I should give the whole thing, and as I asked the question, I never mentioned the name of Herman Thompson. Herman Thompson wasn't even in my mind. I didn't even ask anything concerning the Sheriff's office. I asked quite an entirely different question, as you will see from the transcript, and out of this came a long story in which Mr. Thompson's name was used as explanation of why he felt there was a close personal relationship there that would keep him from going to *319 the Sheriff's office. I neither elicited his name nor did I anticipate his name. Now, when I read the affidavit, I knew the name was in there and I did not consider that this was going to do anything to Mr. Thompson. In fact, I believe it has not. He was a Captain and is a Captain. I don't believe he has been suspended for five minutes and I don't believe he has lost any pay.
Q. Mr. St. Amant, with that knowledge and knowing that this reference to Captain Thompson was in this speech, you then permitted this very speech that we have listened to to be transcribed and circulated to the members of the press?
A. I certainly did. I don't know what this money was for, Mr. Attorney. I did not suggest what the money was for, nor hasdid Mr. Albin suggest what it was for. This could have been for his favorite charity for all I know, but as Mr. Albin explains, he couldn't go to him because he was contributing to this man, for whatever purpose. A close personal relationship existed.
* * * * * *
Q. So you left, you made the remarks, and left the inferences for the public to draw what they might, is that right?
A. I made the remark and let the public draw the conclusion that they might from the remark, which I believe was properly made at the time. I think you will find that Mr. Thompson's name, except from in quoting Mr. Albin, was never mentioned by me and no inference was drawn by me in further questioning that followed this. I had no interest at the time in Mr. Thompson. I had interest in Senator Russell Long, and I wanted to establish that here is a man in the public eye in a most disreputable fashion, and I am sure Mr. Thompson did not think I was speaking of him. I was speaking of the business agent who was notoriously in trouble at the time and was being helped out by a United States Senator to the detriment of his men, to the detriment of the working people of this parish. I believe this was true and I presented it as such. I have had no suits or opposition on this score from anybody else.
Q. In other words, Mr. St. Amant, you were after the big shot, so to speak, Senator Russell Long, and were not worried about the smaller individual, so to speak, that might have been involved down the way, is that correct?
A. Let's not draw an inference from my answer on that. I was not concerned with them. I did not think it concerned them."
It is clear that the Trial Judge was aware of the effect of the New York Times decision, supra, upon actions of this type for he granted a rehearing in order to consider the effect of that case upon the case at issue. The Garrison case, supra, was decided after the New York Times decision and was not considered by the Trial Judge in his reasons for judgment on rehearing. Although the Garrison case dealt with the Louisiana defamation statute, LSA-R.S. 14:47, it is also most relevant to the case at issue for in the Garrison case the rule of the New York Times case on libel was applied to the Louisiana statute and the comments and explanations of the rule in the Garrison case are therefore relevant to the case at issue since it is clear from a reading of both cases that the rule for libel in cases regarding a public official's *320 conduct is the same whether it be civil libel or criminal libel.
We quote below the Trial Judge's Reasons for Judgment on rehearing:
"The Court rendered oral reasons for judgment in favor of the plaintiff in the sum of $5,000.00 on a finding that defendant had libeled plaintiff in a political address which was subsequently printed and distributed by the defendant. The Court has no misgivings about its decision that the remarks made by defendant were libelous but has entertained the motion for a new trial to consider the case in the light of the holding by the United States Supreme Court in the case of New York Times Company v. Sullivan [376 U.S. 254], 84 S.Ct. 710 (1964). That case held that:
"`The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice' that is, with knowledge that it was * * * false or with reckless disregard of whether it was false or not.'
"Therefore, in light of the above quoted case, an inquiry into (1) whether or not the plaintiff is a public official and (2) whether the statement made by defendant was made with `actual malice' that is, with knowledge that it was false or with disregard of whether it was false or not is pertinent to a decision in this case.
"The case of State v. Mayeux [228 La. 6], 81 So.2d 426, had considered the status of a deputy sheriff such as the plaintiff Captain Thompson:
"`A deputy sheriff is a state officer created by the Legislature and his appointment is provided for in LSA-R.S. 33:1433. Williams v. Guerre, 182 La. 745, 162 So. 609, and the authorities cited therein.'
"In Gray v. DeBretton [192 La. 628], 188 So. 722, 724 (1939), further reference to a deputy sheriff as a public officer is made in the following language:
"`The relation between a sheriff and his deputy is an official and not a private relation. The deputy is not a representative of the sheriff in his individual capacity, but he is a public officer whose authority and duty are regulated by law. As to the public, whose servants these officers are, the acts and omissions of a deputy sheriff are the acts and omissions of the sheriff himself.' (Emphasis by the Trial Judge)
"Further evidence that he is a public officer is found in the fact that Article 19, Section 1, of the Constitution of 1921 provides that `All officers * * * shall take the following oath or affirmation * * *,' and R.S. 33:1433 under the title of `Public Officers' provides for the office of deputy sheriff and requires the taking of the oath and for the filing of a bond.
"Having found plaintiff to be a public officer, the rule enunciated in New York Times Company v. Sullivan, supra, is applicable, namely, that malice may not be implied in the case of a public official (officer) and that actual malice must be shown, that is, with knowledge that it (the statement) was false or `with disregard of whether it was false or not.'
"Previously, the Court in its oral decision from the bench applied the Louisiana law which was just recently stated in the case of Lamartiniere v. Daigrepont, 168 So.2d 373 (October 27, 1964), La.App. 3rd Cir.:
"`* * * the defendant states, as a witness, that he entertained neither malice nor ill will against the *321 plaintiff at the time it was uttered; yet, in such case, the law imputes malice to the act, on account of its character, for the use of opprobrious epithets implies malice when they are slanderous per se. It suffices to maintain an action to recover damages without proving special injury to the party defamed.'
"Thus, the Court's decision cannot stand on the basis that malice may be implied by the mere character of the statement in light of its holding that plaintiff is a public official, and that brings us to the final question of whether under the federal rule as enunciated in New York Times Company v. Sullivan (supra) the plaintiff has shown actual malice.
"Mr. St. Amant stated that he intended no malice toward Captain Thompson, that he was in a political fight with Senator Russell Long and had no interest in Captain Thompson. In reply to a question by plaintiff's counsel as to whether he gave any consideration to what effect the statement in the affidavit of Mr. Albin would have on Captain Thompson, he replied that Captain Thompson was not even in his mind. He further testified that he did not consider that Captain Thompson would be harmed by the statement and that he did not know what the money was for and that for all he knew the same could have been for Thompson's favorite charity. Finally, he admitted that as far as he was concerned he would let the public draw whatever inference it liked with regard to his reference to Captain Thompson.
"Therefore, it Mr. St. Amant did not even know Captain Thompson or have any interest in him, and if he did not know what the money was for, which is evidence that he made no attempt to investigate whether there was any relationship between Mr. Partin and Captain Thompson, to justify his charge that Captain Thompson was being paid off, and if he never gave any consideration as to what effect those remarks might have on Captain Thompson's reputation and character and was content to let the public draw whatever inference it desired concerning these remarks, then fairness dictates that despite defendant's avowed absence of ill will toward Captain Thompson or intent to do him harm or damage, he acted with reckless and wanton disregard for whether the statement was false or not and in the language of the Sullivan case `with disregard of whether it (the statement) was false or not.'
"The Court is satisfied that its original opinion was correct, and for the reasons here stated the motion for a new trial is denied and judgment will be signed in favor of the plaintiff as originally rendered herein."
We feel that the definition of a public official as set forth in the Judge's reasons for judgment on rehearing clearly answers the question as to whether or not the plaintiff is or is not a public official, and therefore the plaintiff's contention, as set forth in his brief, that he is not a public official has no merit, and the rule of the New York Times case does apply to plaintiff. We make this statement fully aware that in footnote 23 in the New York Times decision the Court said: "We have no occasion here to determine how far down into the lower ranks of government employees the `public official' designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included." Nor do we agree with the contention that as the Court in the New York Times case did not define official conduct, that the conduct herein was not official but of an extracurricular activity, that is, soliciting money for civic charities. This position is also without merit because it is not that conduct which is criticized in the affidavit.
*322 The affidavit deals with the fears of the affiant concerning the manner in which the plaintiff would or would not discharge his duties if the mentioned safe was stolen. It is the relationship of Mr. Partin and the plaintiff in his official capacity that is the subject of the affidavit, not the reason for the plaintiff's appearances at the Union Hall.
In the New York Times case the Court held that the Constitution limits state power in a civil action brought by a public official for criticism of his official conduct to an award of damages for a false statement "made with `actual malice' that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Garrison v. State of Louisiana, supra. Therefore, the central issue in this case is whether the facts bring it within the rule of the New York Times case, which rule was further enunciated in the Garrison case, and that is, were these statements made with "`actual malice' that is, with knowledge that it was false or with reckless disregard of whether it was false or not." The record does not show that the statements made by the defendant about the plaintiff were made with knowledge that they were false. Therefore, we are not concerned with that portion of the definition of actual malice that deals with "knowledge that it was false" but there is no proof, but are concerned with whether or not, in view of the facts in the case, the statements made by the defendant were made "with reckless disregard of whether it was false or not." It should be pointed out that the proof of actual malice is on the plaintiff, New York Times Company v. Sullivan, supra, that is, the plaintiff must prove that the statements were made with the knowledge that the same were false or with reckless disregard as to whether such statements were false or not.
Neither the Garrison case nor the New York Times case sets forth with any degree of clarity the steps the plaintiff must or must not take in order to determine whether or not statements were made with reckless disregard as to whether such statements were true or false. Mere negligence in determining whether or not a statement is correct is not a showing of actual malice. New York Times Company v. Sullivan, 376 U.S. 254, 288, 84 S.Ct. 710, 730. Nor does speaking out of hatred mean actual malice under the New York Times and Garrison rule. In the Garrison case the Court said:
"Moreover, even where the utterance is false, the great principles of the Constitution which secure freedom of expression in this area preclude attaching adverse consequences to any except the knowing or reckless falsehood. Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth. Under a rule like the Louisiana rule, permitting a finding of malice based on an intent merely to inflict harm, rather than an intent to inflict harm through falsehood, `it becomes a hazardous matter to speak out against a popular politician, with the result that the dishonest and incompetent will be shielded.' Noel, Defamation of Public Officers and Candidates, 49 Col.L.Rev. 875, 893 (1949). * *"
A study of the New York Times case and the Garrison case makes it clear that there must be more than an inference drawn before a statement can be said to fall within the rule of those cases. The mere fact that criticism of the manner in which a public official performs his duties would tend to affect his private reputation as well as his public reputation would not render inapplicable the New York Times rule. Garrison v. State of Louisiana, 379 U.S. 64, 77, 85 S.Ct. 209, 217. It would certainly follow that if the *323 statement made by the District Attorney of Orleans Parish and quoted in the Garrison case to the effect that
"The judges have now made it eloquently clear where their sympathies lie in regard to aggressive vice investigations by refusing to authorize use of the DA's funds to pay for the cost of closing down the Canal Street clip joints,"
is not libelous under the New York Times rule (the application of the civil rule of libel as announced by the Supreme Court in that case to criminal libel in Louisiana), then certainly the statements made by the defendant Mr. St. Amant in the present case would not be libelous under that rule.
There is only one statement in the affidavit involved in this case which could possibly have damaged Captain Thompson and that was the statement "we also knew of money that had passed hands between Ed and Herman Thompson, from Ed to Herman." Since the facts show that the plaintiff was well acquainted with Mr. Partin and had been seen by the Union people collecting money at the Union Hall (which could conceivably make a discontent Union member who was opposed to the Union leadership suspicious of the relationship) the use of the quoted statement could not be said to have been used with reckless disregard as to whether false or true.
The statement of the Trial Judge that Mr. St. Amant did not have any interest in Captain Thompson and did not know what the money was for, which the Judge said is evidence that he made no attempt to investigate whether his statements were true in order to justify his charge that Captain Thompson was being paid off and that he gave no consideration as to what effect the remarks might have on Captain Thompson's reputation and character but was content to let the public draw whatever inference it desired, would not place the case under the New York Times rule of proving he acted with reckless and wanton disregard for whether the statement was false or not. This actually was another way of applying the rule of Lamartiniere v. Daigrepont, La.App., 168 So.2d 373, quoted by the Trial Judge, in that the Trial Judge was imputing malice to the act on account of its character.
It is clear from the record in this case that the reputation of Captain Thompson, who is highly regarded and a well respected police official, was injured by the statements made, which statements had no relevancy whatsoever to the issue which the plaintiff was attempting to get across to the public, and that Captain Thompson was the victim of intemperate "mud slinging." It is also the opinion of this Court that prior to the decisions of the United States Supreme Court in the New York Times and the Garrison cases the words of the plaintiff would have been libelous under the Louisiana jurisprudence. However, in view of the U. S. Supreme Court's holding that the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct, as discussed above, this Court has no alternative but to hold that the judgment of the Trial Court is in error and should be reversed and there should be judgment in favor of the defendant dismissing plaintiff's suit at his cost.
Reversed.