Linus PAULING, Appellant,

v.

**GLOBE–DEMOCRAT PUBLISHING COMPANY, a Corporation,**
**Appellee.**

No. 18082.

United States Court of Appeals
Eighth Circuit.

June 21, 1966.

Lewis C. Green, of Green, Hennings, Henry & Arnold, St. Louis, Mo., for appellant; John Raeburn Green, Thomas C. Coleman and Alan G. Kimbrell, of Green, Hennings, Henry & Arnold, St. Louis, Mo., on the brief.

Lon Hocker, of Hocker, Goodwin & MacGreevy, St. Louis, Mo., for appellee; Henry S. Stolar, of Hocker, Goodwin & MacGreevy, St. Louis, Mo., on the brief.

Before VOGEL, Chief Judge, and BLACKMUN and GIBSON, Circuit Judges.

BLACKMUN, Circuit Judge.

A jury returned a verdict for the defendant in this diversity civil libel action instituted in September 1961 by Linus Pauling against the corporation which publishes the newspaper known as the St. Louis Globe-Democrat. The plaintiff appeals.

Pauling, for many years a professor of chemistry at the California Institute of Technology, is a man of international repute. His status as a scholar and as a scientist is not questioned. His awards include many honorary degrees, recognition by the United States government for meritorious service during World War II, the 1954 Nobel Prize in Chemistry, and, more recently, the Nobel Peace Prize.

The alleged libel grew out of a controversy over Pauling's efforts to promote a nuclear test ban treaty. The libel is

claimed to exist in the following three sentences of the defendant newspaper's editorial, entitled "Glorification of Deceit", published in its issues of October 10, 1960, in respect to an appearance by Pauling before a subcommittee of the United States Senate's Committee on the Judiciary:

"Pauling contemptuously refused to testify and was cited for contempt of Congress. He appealed to the United States District Court to rid him of the contempt citation, which that Court refused to do. The appeal from the lower court's affirmation of contempt is expected to be handed down by the Supreme Court today."

The defendant's editorial in its entirety is attached as an appendix to this opinion.

A review of some of the factual background culminating in the challenged editorial may be enlightening:

Prior to 1960 Professor Pauling evinced concern about nuclear testing. In January 1958, he submitted to the United Nations a petition "urging that an international agreement to stop the testing of nuclear bombs be made now". This was prepared and signed by Pauling and had appended to it a list of the names of 9,234 other scientists from throughout the world. An additional list of 1,803 was submitted by him in July. The two lists, with Pauling, made a total of 11,-038 names. The original signatures were retained by Pauling and did not accompany the petition.

Also, about this time, the professor and other United States citizens and some non-resident aliens sought, in the United States District Court for the District of Columbia, to enjoin the Secretary of Defense and the Atomic Energy Commission from detonating nuclear weapons. Judge Keech dismissed the complaints on the grounds that they failed to state a justiciable controversy and that none of the plaintiffs had standing to sue. Pauling v. McElroy, 164 F.Supp. 390 (D.D.C.

1958). The Court of Appeals affirmed, 107 U.S.App.D.C. 372, 278 F.2d 252 (1960). The Supreme Court denied certiorari, 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed. 2d 60.

Dr. Pauling's efforts in this direction came to be a matter of interest to the Judiciary Committee's Subcommittee on Internal Security. Hearings on his activity were held on June 21 and October 11, 1960. Pauling was subpoenaed and testified on both occasions.[1]

At the June 21 hearing the subcommittee manifested a desire to obtain three things from Dr. Pauling: The signatures to the petition; the names of the persons to whom Pauling had written requesting assistance in obtaining signatures; and the letters with which the signatures were transmitted to Pauling. Although he agreed to produce the signatures and a list of the persons to whom he had written for assistance in their collection, he refused a request to supply a list of persons who had transmitted signatures to him. His refusal was essentially on the grounds that this would expose the participants to reprisals and would violate a trust they had reposed in him. At the conclusion of the hearing on June 21 the subcommittee ordered Dr. Pauling to appear on August 9 and to bring with him all signatures to the petition presented to the United Nations and all letters of transmittal with which those signatures came to him. The hearing so scheduled for August 9 was thereafter postponed to October 11.

In the meantime, Pauling instituted an action in the United States District Court for the District of Columbia against Senators Eastland and Dodd (the subcommittee's chairman and vice-chairman respectively), the United States Attorney for the District of Columbia, and the Sergeant-at-Arms of the Senate. In his complaint Pauling alleged that the subcommittee's order of June 21 was violative of his rights under the First and Fourth Amendments and called for the

---

1. Reports of these hearings were made and printed for the use of the Committee on the Judiciary. The Report of the June 21, 1960, hearing contains, at pp. 79–355, the 11,038 names on the two lists.

production of papers not pertinent to any lawful inquiry; he expressed willingness, however, to produce the signatures of United States residents who had signed the petition. Pauling requested a declaratory judgment as to his rights and duties with respect to the subcommittee's order and as to its validity. He also sought injunctive relief against enforcement of the order and against his being prosecuted for any failure to comply with it. Judge McGarraghy, on August 23, 1960, granted the defense motion to dismiss. He did so on the grounds that the challenged order was not subject to judicial review in that action; that the plaintiff had an adequate remedy at law in the event of proceedings against him; and that the relief sought would require an unauthorized interference with the legislative branch. Again the Court of Appeals affirmed, Pauling v. Eastland, 109 U.S.App.D.C. 342, 288 F.2d 126 (1960), and the Supreme Court denied certiorari, 364 U.S. 900, 81 S.Ct. 233, 5 L.Ed.2d 194.

While that appeal was pending Pauling advised the Court of Appeals by letter that he was ready to submit the original signatures to the subcommittee. During the pendency of the petition for certiorari a request was made that the subcommittee postpone further hearing until the Supreme Court acted. This request was denied and the second hearing took place on October 11. At that time Dr. Pauling produced the signatures. A week earlier he had sent the subcommittee a list of the persons, about 1200 in number, whose assistance he had requested. He continued to refuse, however, to comply with that part of the order which called for the production of the transmittal letters. He renewed his contention that to do so would subject the participants to reprisals. At the end of the hearing Dr. Pauling was excused from the subpoena.

At this point we note, parenthetically, that Pauling, together with over 100 United States nationals and more than 100 aliens, subsequently instituted still another suit in the United States District Court for the District of Columbia to restrain the Secretary of Defense and the Atomic Energy Commission from detonating any nuclear weapon. This time Judge McLaughlin granted the defense motion to dismiss. He did so on the grounds that the plaintiffs had no standing to sue; that the complaint failed to state a justiciable controversy; that the actions and powers challenged were plainly authorized by law and the Constitution; and that the matter was res judicata by the earlier holding in Pauling v. McElroy, supra. The Court of Appeals, in a vigorous opinion, affirmed and said that the district court "was plainly correct on all points." Pauling v. McNamara, 118 U.S.App.D.C. 50, 331 F.2d 796, 798 (1963). Certiorari was denied, 377 U.S. 933, 12 L.Ed.2d 297.

We now return to the present case. The plaintiff by his complaint asserts that the statements in the editorial's three sentences quoted above were false in that Pauling was not cited for contempt of Congress, in that he did not appeal to any court to rid himself of any contempt citation, and in that no appeal from a court's affirmation of contempt was expected because there had been no such affirmation. Pauling also alleges that the defendant published the quoted statements when it knew or should have known that they were false. He seeks both compensatory and punitive damages.

The defendant newspaper, by its amended answer, admits that Pauling had not been cited for contempt of Congress and had not appealed to any court to rid himself of a contempt citation, and that the editorial's contrary statements "are literally false", but it denies that in "the context in which they appeared they were false in substance and effect." The defendant further alleges "that the gist and thrust" of the publication was that Pauling "was contemptuous of the authority of the Congress of the United States" in that he had contemptuously refused to testify as to the identity of the persons who had helped him collect the petition; that he had unsuccessfully invoked federal judicial power to prevent

his being punished for his contemptuous actions; that "the gist and thrust of the publication was and is true"; and [as amended at the trial] that Pauling "voluntarily sought public expression of his views on national policy and invited public comment thereon".

Pauling's motions for summary judgment and for a directed verdict on the issue of liability were denied. As above noted, the case was submitted to the jury and the jury brought in a general verdict for the defendant.

On this appeal Pauling renews his argument that the defendant is liable as a matter of law and that the trial court should have instructed the jury to that effect and allowed it to pass only on the issue of damages. Pauling also urges error in the instructions, in the admission of evidence, and in other aspects of the conduct of the trial.

The defendant in response argues that the trial court's refusal to grant the plaintiff a summary judgment or directed verdict on the issue of liability was proper because this was prohibited under the terms of the Missouri Constitution; Article I, § 8, V.A.M.S., and by the First Amendment; there was a genuine issue of substantial truth; the subject of the challenged publication was a matter of grave national interest; and the essential ingredient of defendant's liability, namely, actual malice, was not alleged and was insufficiently proved. It also argues that there was no reversible error in the instructions, in the admission of evidence, or in the trial's conduct. It finally urges a failure to plead and prove a claim for relief for libel under constitutional standards recently enunciated by the Supreme Court.

We go directly to this last argument of the defense. The trial in the district court took place March 16–19, 1964. Seven days before the trial began the Supreme Court decided New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). It is obvious from the record that it was because of the promulgation of the opinions in *New York Times* that the defendant further amended its answer, by leave during the trial, to add the allegation, above noted, that Pauling "voluntarily sought public expression of his views on national policy and invited public comment thereon"; indeed, the *New York Times* decision was specifically pleaded. The district court refused to instruct the jury on the *New York Times* issue but allowed the amendment in order to preserve the point for appeal.

*New York Times* reaches the question whether the freedom of speech and of the press guarantees of the First and Fourteenth Amendments limit state power to award damages to a "public official" for defamatory falsehood relating to his official conduct. The answer is that the amendments do limit such state power unless the plaintiff "proves that the statement was made with 'actual malice' —that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Pp. 279–380 of 376 U.S., p. 726 of 84 S.Ct.

The advertisement which was the subject of that litigation is really not dissimilar to the editorial with which we are now concerned. Both bore upon controversial public issues. Each was generally true; each was partially false. The Alabama courts had held that the statements in the advertisement were "libelous per se" against a Montgomery city commissioner charged with the supervision of the police department, and the Alabama jury was so instructed. The Supreme Court held, pp. 269–288 of 376 U.S., p. 720 of 84 S.Ct., that libel, as such, is not immune from constitutional limitations but "must be measured by standards that satisfy the First Amendment"; that there has been "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials"; that constitutional protection does not turn upon the truth or popularity of the ideas and beliefs offered; that erroneous statement is "inevitable in free debate, and that it

must be protected if the freedoms of expression are to have the 'breathing space' that they 'need * * * to survive' "; that neither factual error nor defamatory content removes "the constitutional shield from criticism of official conduct"; that the allowance of the defense of truth does not save the state libel rule; that public discussion of official conduct enjoys a privilege under the First and Fourteenth Amendments in the absence of actual malice; that the Alabama rule which presumes malice, where general damages are concerned, is inconsistent with constitutional limitations; that the Court had the duty to review the evidence to see whether it could constitutionally support a finding of actual malice; that a statement by the newspaper's officer that he thought the advertisement was substantially correct was at least a reasonable opinion and there was no evidence to impeach his good faith in holding it; that under the circumstances the failure to retract was not adequate evidence of malice for constitutional purposes; and that the evidence at most supported a finding of negligence which fell short of actual malice. At footnote 23, on p. 283 of 376 U.S., on page 727 of 84 S.Ct., the Court significantly observed:

> "We have no occasion here to determine how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included. Cf. Barr v. Matteo, 360 U.S. 564, 573–575, [79 S.Ct. 1335, 3 L.Ed.2d 1434]. Nor need we here determine the boundaries of the 'official conduct' concept. It is enough for the present case that respondent's position as an elected city commissioner clearly made him a public official, and that the allegations in the advertisement concerned what was allegedly his official conduct as Commissioner in charge of the Police Department."

Mr. Justice Black, with Mr. Justice Douglas joining him, concurred separately on the ground that the First and Fourteenth Amendments "completely prohibit" a state from awarding damages to public officials against critics of their official conduct and that the defendants "had an absolute, unconditional constitutional right to publish * * * their criticisms of the * * * agencies and officials." P. 293 of 376 U.S., p. 733 of 84 S.Ct. Mr. Justice Goldberg, with Mr. Justice Douglas joining him, separately concurred and stated his "belief that the Constitution affords greater protection than that provided by the Court's standard to citizen and press in exercising the right of public criticism." P. 298 of 376 U.S., p. 735 of 84 S.Ct. Yet he carefully pointed out, p. 301, 84 S.Ct. p. 737, that "This is not to say that the Constitution protects defamatory statements directed agains the private conduct of a public official or a private citizen".

The companion question as to whether the rule of *New York Times* "also limits state power to impose criminal sanctions for criticism of the official conduct of public officials" promptly presented itself in Garrison v. State of Louisiana, 379 U.S. 64, 67, 85 S.Ct. 209, 212, 13 L.Ed.2d 125 (1964). That case concerned remarks made by a district attorney about judges of the criminal district court of his Louisiana parish. The Court's answer to the question was flatly in the affirmative:

> "The constitutional guarantees of freedom of expression compel application of the same standard to the criminal remedy. * * * [O]nly those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions. For speech concerning public affairs is more than self-expression; it is the essence of self-government. * * *

> "The use of calculated falsehood, however, would put a different cast on the constitutional question. * * * Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not

enjoy constitutional protection." Pp. 74–75 of 379 U.S., p. 216 of 85 S.Ct. In answering the suggestion that the alleged defamatory statement was an attack upon the judges' personal integrity, rather than on their official conduct, the Court held that the rule of *New York Times* "is not rendered inapplicable merely because an official's private reputation, as well as his public reputation, is harmed." P. 77 of 379 U.S. p. 217 of 85 S.Ct. Justices Black, Douglas, and Goldberg each filed a concurring opinion reflecting views about as expressed in *New York Times*.

The Court made the same ruling in Moity v. Louisiana, 379 U.S. 201, 85 S.Ct. 323, 13 L.Ed.2d 339 (1964), concerning alleged defamation of a district attorney of a Louisiana parish (see State v. Moity, 245 La. 546, 159 So.2d 149 (1963)), and in Henry v. Collins, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965), concerning a statement relating to a Mississippi county attorney and chief of police.

The Supreme Court's most recent expression on this subject is Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed. 597 (1966). This was a New Hampshire civil libel action against the author of a newspaper column for allegedly defamatory and false comment concerning the plaintiff's performance when he was a supervisor of a county recreation area. The plaintiff was employed by elected county commissioners. The trial antedated the Supreme Court's decision in *New York Times*.

The Court held that the question whether the plaintiff was a "public official" within *New York Times* was not to be answered under state law standards. It made specific reference to its footnote 23 in *New York Times* and here, too, observed that "No precise lines need be drawn for the purposes of this case" in determining the reach of the "public official" concept. It stated,

"There is, first, a strong interest in debate on public issues, and, second, a strong interest in debate about those persons who are in a position signifi-

cantly to influence the resolution of those issues. * * * It is clear, therefore, that the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." [footnote omitted] P. 85 of 383 U.S., p. 675 of 86 S.Ct.

The Court noted, p. 86, 86 S.Ct. p. 676, the tension between society's interest in preventing and redressing attacks upon reputation, on the one hand, and, on the other, "the values nurtured by the First and Fourteenth Amendments" and stated that "when interests in public discussion are particularly strong * * * the Constitution limits the protections afforded by the law of defamation." Because *New York Times* had not been decided when Baer's case went to trial, the Court felt his presentation was not shaped to the "public official" issue. The case, accordingly, was remanded and Baer was given an opportunity to prove that he was outside *New York Times* or, if not, that he presented a jury question of malice. Again, a significant feature is the Court's footnote 12 on p. 86 of 383 U.S., on p. 676 of 86 S.Ct.:

"We are treating here only the element of public position, since that is all that has been argued and briefed. We intimate no view whatever whether there are other bases for applying the *New York Times* standards—for example, that in a particular case the interests in reputation are relatively insubstantial, because the subject of discussion has thrust himself into the vortex of the discussion of a question of pressing public concern."

Mr. Justice Clark, without comment, concurred in the result. Mr. Justice Douglas separately concurred and said, p. 90, 86 S.Ct. p. 678, "I cannot relate [the term 'public official'] only to those who, by the Court's standard, are deemed to hold public office"; he asked the question, "But since freedom of speech is now the guideline, do state libel laws have any

place at all in our constitutional system, at least when it comes to public issues?" Mr. Justice Stewart separately concurred with the observation that this and the *New York Times* and *Garrison* cases turn on the proposition that state defamation laws cannot constitutionally be converted into laws against seditious libel but that the First Amendment is not "the only guidepost in the area of state defamation laws." Pp. 91–92, 86 S.Ct. p. 679. Mr. Justice Black, with Mr. Justice Douglas joining him, concurred in the reversal but dissented as to the new trial direction. He repeated his observation in *New York Times* that "An unconditional right to say what one pleases about public affairs is what I consider to be the minimum guarantee of the First Amendment." He would not allow "the right to criticize a public agent engaged in public activities" to depend upon his being "arbitrarily labeled a 'public official.'" P. 95, 86 S. Ct. p. 680. Mr. Justice Harlan dissented from a part of the opinion with which we are not here concerned. Mr. Justice Fortas dissented on the ground that the writ of certiorari had been improvidently granted.

It is of interest to note that the *New York Times* principle was extended by the Court through the path of preemption into the field of labor relations in a case decided the same day as Rosenblatt v. Baer. Linn v. United Plant Guard Workers of America, 383 U.S. 53, 65, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966).

We feel that the majority opinions in these Supreme Court cases (all of which were written by Mr. Justice Brennan except, possibly, the per curiams in Moity v. Louisiana and Henry v. Collins) establish for us the following: (1) The Court recognizes as a national "principle" the desirability of uninhibited debate about public issues. (2) It also recognizes "a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues". (3) In the absence of malice, the First and Fourteenth Amendments afford a privilege to public discussion of official conduct even though it

has some factually erroneous or defamatory content. (4) Malice, in this connection, equates with knowledge of the falsity of the statement or with reckless disregard of whether it is false or not. (5) The Court thus far has specifically refrained from fixing a limit for its concept of "public official", either among the ranks of government employees "or otherwise". (6) It has, however, included within the term a city commissioner, a trial judge, a prosecutor, and a chief of police, and it has not excluded a recreation supervisor appointed by elected county commissioners. (7) Similarly, the Court has not yet fixed a boundary for its "official conduct" concept. (8) At least two present members of the Court feel that the majority's standard for privilege falls short of appropriate constitutional protection. (9) The Court thus far has also refrained from expressing a view as to "whether there are other bases" for applying the standards of *New York Times*, specifying, as a possible example, the subject who "has thrust himself into the vortex of the discussion of a question of pressing public concern". (10) The Court has applied the *New York Times* principle by analogy in the labor field.

These Supreme Court cases, therefore, may not take us so far as the facts of the present case or provide incontestably controlling precedent for us here; rather, we are concerned with the express reservations of the *New York Times* and *Rosenblatt* footnotes. Concededly, Dr. Pauling was not a public official and the Globe-Democrat editorial, therefore, was not one in criticism of official conduct in the governmental sense.

We feel, however, that the implications of the Supreme Court's majority opinions are clear. Professor Pauling, by his public statements and actions, was projecting himself into the arena of public controversy and into the very "vortex of the discussion of a question of pressing public concern". He was attempting to influence the resolution of an issue which was important, which was of profound effect, which was public and which was internationally controversial. Because of

his world prominence—a factor stressed by his counsel in the present case—he was in a position of some influence on the problem's resolution. He obviously deemed himself influential and he was undertaking to provide leadership among academic and scientific people and to bring forces from many nations of differing political ideologies to bear upon the problem. Although Dr. Pauling did not take the stand himself, the record here clearly establishes, by evidence adduced primarily by the plaintiff, his preparation of the petition to the United Nations, his taking the lead in soliciting supporting signatures, his devotion of a substantial portion, "perhaps a third", of his time to attracting public attention to the problems of nuclear testing, his speaking and writing widely on the subject, and even his participation in sign carrying and picketing on the issue near the White House and elsewhere. His instigation of the several lawsuits we have described above is a self-evident additional factor.

■ We recognize that it is arguable that the *New York Times* rule should not be extended beyond governmental officials. One may point out that many public officials enjoy either an absolute or conditional privilege as to statements made in the line of duty and that the Supreme Court recognized this in *New York Times,* p. 282 of 376 U.S., 84 S.Ct. 710, and in *Garrison,* p. 74 of 379 U.S., 85 S. Ct. 209, 215, and used it in support of its conclusions in those cases, namely, to avoid giving "public servants an unjustified preference over the public they serve." One may say, too, that, while the public interest requires free and open discussion of the qualifications, conduct and views of public officials, there is no comparable need as to the attributes of private citizens, however much public attention they have succeeded in acquiring. We feel, however, that the Supreme Court's use of the undesirable preference argument is not a significant part of the rationale of its cases and that it was employed only as a final or clinching factor. Indeed, in Rosenblatt v. Baer, footnote 10,

pp. 84–85 of 383 U.S., 86 S.Ct. 669, 675, the Court specifically denies that it ties the *New York Times* rule to the rule of official privilege. "The public interests protected * * * are interests in discussion, not retaliation. * * * " And the Court itself has pointed out that the reciprocal privileges are not congruent.

■ We also feel that a rational distinction cannot be founded on the assumption that criticism of private citizens who seek to lead in the determination of national policy will be less important to the public interest than will criticism of government officials. A lobbyist, a person dominant in a political party, the head of any pressure group, or any significant leader may possess a capacity for influencing public policy as great or greater than that of a comparatively minor public official who is clearly subject to *New York Times*. It would seem, therefore, that if such a person seeks to realize upon his capacity to guide public policy and in the process is criticized, he should have no greater remedy than does his counterpart in public office.

■ We hold that the principle of *New York Times* and its companion cases is applicable here and that these particular activities of this particular plaintiff fall into that area where the First and the Fourteenth Amendments of the Constitution of the United States afford privilege to critical comment which is free from malice.

We note nothing significantly to the contrary to all this in the developing law in the state and lower federal courts. The application of the *New York Times* principle seems to be an expanding and not a restricting one. It has been applied, over opposition, to appointed as well as to elected officials. Rosenblatt v. Baer, supra (semble); Pape v. Time, Inc., 354 F.2d 558, 559–560 (7 Cir. 1965), cert. denied 86 S.Ct. 1339, 16 L.Ed.2d 361 (deputy chief of detectives and lieutenant of police); Gilligan v. King, 48 Misc.2d 212, 264 N.Y.S.2d 309 (Sup.1965) (police lieutenant); Thompson v. St. Amant, 184 So.2d 314, 321 (La.App.1966) (deputy

sheriff); McNabb v. Tennessean Newspapers, Inc., Tenn.App., 400 S.W.2d 871 (1965) (chairman of County Democratic Primary Board); Rives, C. J., dissenting in Curtis Publishing Co. v. Butts, 351 F. 2d 702, 721 (5 Cir. 1965), petition for cert. pending. See Application of Levine, 97 Ariz. 88, 397 P.2d 205, 211 (1964) (director of the FBI). Contra, Butts v. Curtis Publishing Co., 242 F.Supp. 390, 394 (N.D.Ga.1964) (university athletic director), affirmed on other grounds, Curtis Publishing Co. v. Butts, supra, pp. 709–713 of 351 F.2d.

It has been applied to candidates for office as well as to incumbents. Block v. Benton, 44 Misc.2d 1053, 255 N.Y.S.2d 767 (Sup.1964); State v. Browne, 86 N. J.Super. 217, 206 A.2d 591, 598–599 (App.Div.1965). See Pauling v. News Syndicate Co., 335 F.2d 659, 671 (2 Cir. 1964), cert. denied 379 U.S. 968, 85 S.Ct. 662, 13 L.Ed.2d 561; Gilberg v. Goffi, 21 App.Div.2d 517, 251 N.Y.S.2d 823 (Sup. 1964), aff'd 15 N.Y.2d 1023, 260 N.Y.S. 2d 29, 207 N.E.2d 620 (1965); Clark v. Allen, 415 Pa. 484, 204 A.2d 42, 44 (1964). This view is afforded substance by the quotations from Coleman v. MacLennan, 78 Kan. 711, 98 P. 281, 20 L.R.A.,N.S., 361 (1908), which appear in the *New York Times* opinion itself, pp. 280–282 of 376 U.S., 84 S.Ct. 710.

And the principle has also been applied to persons in their private capacities. Two cases concerning private citizens arose out of an election contest and affected the plaintiff by virtue of his relationship to the candidate, Gilberg v. Goffi, supra (partner in mayor's law firm), and, as a matter of state common law, Pearson v. Fairbanks Publishing Co., Alaska, 413 P.2d 711, 714 (1966). Compare, however, Powell v. Monitor Publishing Co., N.H., 217 A.2d 193 (1966). But there are at least two flat holdings that the principle applies where a person of prominence involves himself in a matter of great public concern. Walker v. Courier-Journal & Louisville Times Co., 246 F.Supp. 231 (W.D.Ky.1965); Pauling v. National Review, Inc., 269 N.Y.S. 2d 11 (Sup.1966). Judge Friendly's dic-

tum in Pauling v. News Syndicate Co., supra, p. 671 of 335 F.2d, displays the logical application of the principle to this situation. Compare Nusbaum v. Newark Morning Ledger Co., 86 N.J.Super. 132, 206 A.2d 185, 198–199 (App.Div.1965). Contra, Associated Press v. Walker, 393 S.W.2d 671, 680 (Tex.Civ.App.1965), an opinion with no citation of *New York Times*. Negative implications also appear to be present in Clark v. Pearson, 248 F.Supp. 188, 195 (D.D.C.1965), and in Harper v. National Review, Inc., 33 L.W. 2341 (N.Y.Sup.1964), aff'd 263 N. Y.S.2d 292 (App.Div.1965).

There are, of course, fact situations where the courts understandably have refused to apply the principle. These include cases where the subject, although perhaps a public figure, did not conduct himself or speak out on a matter of public import, Dempsey v. Time, Inc., 43 Misc. 2d 754, 252 N.Y.S.2d 186, 189 (Sup.1964), aff'd 22 A.D.2d 854, 254 N.Y.S.2d 80 (1964) (prizefighter); Spahn v. Julian Messner, Inc., 43 Misc.2d 219, 250 N.Y.S. 2d 529, 535 (Sup.1964), aff'd 23 A.D. 216, 260 N.Y.S.2d 451 (1965) (baseball pitcher); Faulk v. Aware, Inc., 14 N.Y.2d 954, 253 N.Y.S.2d 990, 202 N.E.2d 372 (1964), cert. denied 380 U.S. 916, 85 S.Ct. 900, 13 L.Ed.2d 801 (radio and television performer); Lorillard v. Field Enterprises, Inc., 65 Ill.App.2d 65, 213 N.E.2d 1, 7 (1965) (socialite), or where the subject was a person prominent only in another country, Fignole v. Curtis Publishing Co., 247 F.Supp. 595 (S.D.N.Y.1965) (Haitian political figure); Youssoupoff v. Columbia Broadcasting System, Inc., 48 Misc.2d 700, 265 N.Y.S.2d 754, 756–759 (1965) (Russian political figure). Some of these cases assume an invasion of privacy posture.

As indicated above, however, once the principle of *New York Times* is accepted —and our only choice is to accept it— logic commands that it be applied to a person such as Dr. Pauling when, as here, he has projected himself into the arena of public policy, public controversy, and "pressing public concern".

This brings us to the issue of malice in the present case. As has been noted, *New York Times* has an exception and affords no protection for a false statement "made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not", pp. 279–280 of 376 U.S., p. 726 of 84 S.Ct. or, as said in Garrison v. Louisiana, p. 74 of 379 U.S., p. 216 of 85 S.Ct., "with the high degree of awareness of [its] probable falsity demanded by *New York Times*."

Does the record here conclusively reveal this type of malice or, if not, does justice require that the case be remanded for a new trial as the Supreme Court ordered in Rosenblatt v. Baer, supra? We arrive at a negative answer to both questions.

First, we repeat our observation that, although at the time of the trial of this case *New York Times* had just been decided, it nevertheless had appeared before the trial began and its presence was known to both counsel and to the trial court. The defendant newspaper, at the commencement of the trial, moved to amend its answer to incorporate a defense based on *New York Times*. Prior to the submission of the case to the jury this motion was granted. The answer, as then amended, made specific reference to the *New York Times* decision and its controlling precedent in the absence of actual malice. The district court stated that, although it felt *New York Times* was not applicable here, the amendment would serve to preserve the point for appeal. The issue, therefore, was obviously before court and counsel at the trial and we cannot assume that the case was not framed and tried, or need not have been so framed and tried, under the hovering presence of *New York Times*.

■ Further, the plaintiff asserts that he alleged and proved malice. The complaint did refer to malice, although perhaps only in the pre-*New York Times* and state law sense. It described the accused editorial as "malicious" and it asserted that it was published "when defendant knew or should have known that [its accused statements] were false". Plaintiff's counsel referred to malice in his opening statement and in his argument to the jury. The claimed proof of malice consisted of the defendant's publication in its newspaper of letters to the editor, a cartoon, and a series of adverse editorial comments on Dr. Pauling both before and after the editorial of October 10; a deposition concession by the defendant's editor that "We felt he was about to be cited, he wasn't"; and the fact the accused material was an editorial rather than a paid advertisement, as in *New York Times*, or something furnished by a national agency, as in *Walker*, supra.

Our conclusion is that these factors of asserted proof add up to something far less than the definition of actual malice prescribed for the *New York Times* exception and fall short of "the convincing clarity which the constitutional standard demands." Pp. 285–286 of 376 U.S., p. 729 of 84 S.Ct. Singly or in the aggregate, these factors might possibly be found to constitute reportorial negligence or antagonism or contempt for Dr. Pauling and his views and methods. Yet, each and all of these have been held to be less than "actual malice". *New York Times*, p. 288 of 376 U.S., 84 S.Ct. 710 (negligence); Garrison v. Louisiana, pp. 73 and 78–79 of 379 U.S., 85 S.Ct. 209 (hatred, ill will, negligence); Henry v. Collins, p. 357 of 380 U.S., 85 S.Ct. 992 (intent to inflict harm); Rosenblatt v. Baer, p. 84 of 383 U.S., 86 S.Ct. 669 (negligence).

■■ In any event, the jury returned a verdict in favor of the defendant and did so on instructions more favorable to the plaintiff than instructions based on *New York Times* could have been.[2] The

2. The court instructed the jury that the offending statement was susceptible of two meanings; that the jury was to determine which of the two meanings an ordinary reader would give the material; that under the first possible meaning, if the statement did not directly impute a crime, then, for the publication to be libelous,

"you must also find that the article was a malicious defamation of the plaintiff. * * * By malice is meant malice in fact as distinguished from presumed malice, that is, the actual pres-

instructions given were based on the pre- and ex-*New York Times* Missouri law of libel. See Riss v. Anderson, 304 F.2d 188, 194–195, 198 (8 Cir. 1962) and cases cited. The burden of proof, of course, is on Pauling. *New York Times*, p. 284 of 376 U.S., 84 S.Ct. 710; Pape v. Time, Inc., supra, p. 560 of 354 F.2d. The jury by its verdict has found that this burden was not sustained even on the less stringent standards enunciated by the trial court.

We therefore find on this record nothing parallel to the factors which prompted the Supreme Court to remand Rosenblatt v. Baer for a new trial. This case was tried after *New York Times*. The exception to the rule was there for the plaintiff to see and to meet if he could, was apparent and known by counsel, and, by the jury's verdict, was not met.

This makes it unnecessary for us to consider the plaintiff's claimed errors as to instructions, evidence, and trial conduct. The judgment dismissing the action on the merits is affirmed.

APPENDIX

Saint Louis Globe-Democrat editorial in its issues of October 10, 1960:

"GLORIFICATION OF DECEIT.

"The petition of 140 members of the Washington University faculty in support of the defiance of Linus Pauling of the United States Senate dangerously compromises the good name and patriotism of that great University.

"As might be expected, among the first 16 organizers and signers are Edward U. Condon, once described by a House Committee as the 'weakest link in America's security chain,' and Barry Commoner, a man who has consistently fought every attempt to keep America sufficiently strong in the nuclear field to maintain peace by deterring aggression.

"The background of the present attempt of the Senate to defend its own integrity and that of the nation is this: Three years ago, Pauling organized a petition which obtained a number of signatures calling for the United Nations to bar nuclear testing. At the very least, the petition was identical with Russian policy then and now, which calls for cessation of nuclear testing and disarmament without the safeguards of inspection.

"The United States national policy agrees on the desirability of both aims, but insists upon the wholly realistic safeguard of foolproof inspection. This same approach recognizes the utter folly of trusting the Russians to keep their word on anything, considering the overwhelming evidence of their consistent cheating on every commitment they have made in the past 40 years.

ence of an improper motive on the part of the defendant implying the purpose and desire to injure. It may, and in common acceptation does, denote that the defendant was actuated by spite or ill will towards the plaintiff, but in its legal significance such degree of personal hostility is not in all events essential. On the contrary, it is the willfullness or evil intent of the act—the wanton disregard of the rights and interests of the party injured—which suffices to render the act malicious in its legal sense; and hence the usual definition that by malice is meant the intentional doing of a wrongful act without just cause or excuse. It is likewise a wrong motive, which would tend to show malice to state something as the truth without knowing whether it is true, recklessly, and without any reasonable at-

tempt to find out about it or with complete disregard of other known facts"; that under the second possible meaning, namely, a violation of 2 U.S.C. § 192, the statement was libelous per se by directly imputing a crime; and that then "The Court further instructs the jury that it is libelous to maliciously defame any person by publishing falsely in a newspaper of and concerning such person that he has been cited for contempt of Congress, and that there has been an affirmation of contempt of Congress by a United States Court. Such a publication is said to be actionable per se or of itself. By this is meant that such publication if false is presumed to be malicious, and it is not necessary to prove any express malice in order to warrant a verdict for the plaintiff ᵒ ᵒ ᵒ"

"The Senate Internal Security Subcommittee very properly felt that a movement of this sort, which if successful might have laid America and the Free World bare to attack and defeat by the Communists, might have been Communist inspired.

"The Senate subcommittee called Pauling to testify as to who helped him collect the petitions. Pauling contemptuously refused to testify and was cited for contempt of Congress. He appealed to the United States District Court to rid him of the contempt citation, which that Court refused to do. The appeal from the lower court's affirmation of contempt is expected to be handed down by the Supreme Court today.

"It would be idle to guess as to that decision, but we cannot but note that the Supreme Court has been woefully weak in upholding the basic right of the nation to defend itself against the Communist conspiracy in recent years.

"The basic issue, regardless of a Supreme Court decision which might, like others, have to be repaired by the Congress, is whether Pauling or anyone else should testify as to his accomplices. Pauling insists that he is a better judge than the Congress or any court as to what is right and what is wrong. The Senate does not concur in this view.

"The Washington University group clothes their defense of Pauling in self-righteous and ringing phrases— 'historic service to humanity,' 'highest patriotism,' 'constitutionally guaranteed freedoms' and 'civic duties.'

"These great words are, like the phrases of the Communists, a prostitution of the best and most meaningful words in our language in their present connection, for their own purposes.

"The basic question is whether the Senate can inquire into matters concerning the defense of the nation, and whether the United States should be able to defend itself by any and all means at its disposal against threats or the well-founded fears of threats against its own security.

"We believe it should. We believe that the Senate acted in good conscience in investigating a proposal which might have wrecked the strength and security of the state.

"Much is made of the fact that Pauling is a Nobel Prize winner. That is no guarantee of anything more than proficiency in chemistry. It certainly is no guarantee of either patriotism or correctness in foreign policy. It above all does not cloak him with an immunity to defy the Senate and to decide on his own prerogative what is best for America.

"A great St. Louis institution is being badly used, nor is it the first time, by a group which glorifies deceit and evasion in the outrageous guise of freedom of speech and conscience."